UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X
WELLS FARGO BANK, N.A., as Trustee
for the registered holders of J.P.
Morgan Chase Commercial Mortgage
Corp., Commercial Mortgage
Pass-Through Certificates, Series
2002-CIBC4, acting by and through
its Special Servicer, LNR Partners,
LLC,

                    Plaintiff,           <u>OPINION</u>

       -against-

                                          12 Civ. 6168 (MGC)

JPMORGAN CHASE BANK, N.A.,

                    Defendant.

------------------------------------X

APPEARANCES:

        VENABLE LLP
        Attorneys for Plaintiff
        750 East Pratt Street, Suite 900
        Baltimore, Maryland 21202

        1270 Avenue of the Americas, 25th Floor
        New York, New York 10020

        By:  Gregory A. Cross, Esq.
            Colleen M. Mallon, Esq.
            Edmund M. O'Toole, Esq.

        SIDLEY AUSTIN LLP
        Attorneys for Defendant
        787 Seventh Avenue
        New York, New York 10019

        By:  John G. Hutchinson, Esq.
            Benjamin R. Nagin, Esq.
            Colin J. Garry, Esq.

**Cedarbaum, J.**

In this diversity suit, Wells Fargo Bank, N.A., as trustee for the registered holders of J.P. Morgan Chase Commercial Mortgage Pass-Through Certificates, Series 2002-CIBC4, acting by and through its special servicer LNR Partners, LLC, sues JPMorgan Chase Bank, N.A.  Wells Fargo alleges a breach of contract related to representations and warranties made by JPMorgan in a mortgage loan purchase agreement.  JPMorgan moves to dismiss the complaint as time barred.  For the reasons that follow, the motion to dismiss is granted.

**FACTS**

The complaint alleges the following facts.  Since 1979, Highland Mall Limited Partnership leased a parcel of land in Austin, Texas for the purpose of operating a shopping mall.  The property covered by this "Ground Lease" included only a portion of the Highland Mall.  Crucially, it excluded the mall's three "anchor stores" -- the prominent retailers expected to draw customers to the mall for the benefit of the smaller shops.

On June 28, 2001, as part of a refinancing, JPMorgan originated and extended a $71 million commercial loan to the Partnership.  The loan was secured in part by the Partnership's interest in the Ground Lease through a leasehold deed of trust and security agreement.  Concurrent with the refinancing, the Ground Lease was amended to add Section 5.06(a), which Wells

2

Fargo calls the "First Class Mall Restriction."  Compl. at 2.
This provision required the Partnership "to operate the Leased
Property at all times in accordance with prevailing standards
for 'first class regional shopping malls located in the United
States of America.'"

Wholly separate from the First Class Mall Restriction was a
second agreement governing the mall's anchor stores.  That
operating agreement required retail use of the anchor stores
through August of 2001 but thereafter imposed no restrictions on
the properties' use.  It also provided for a parking area for
the Highland Mall extending through 2068 if the anchor stores
remained operational, and through 2021 otherwise.

In February of 2002 JPMorgan generated for the
Partnership's loan an underwriting summary that "emphasized" the
mall's anchor stores and "acknowledged" that the anchor stores
provided support for other tenants.  The underwriting summary
mentioned neither 1) that the First Class Mall Restriction in
the Ground Lease was not tied to the retail operating covenant
governing the anchor stores, nor 2) that the anchor stores'
retail covenants were set to expire during the term of the
commercial loan.

On April 29, 2002, JPMorgan sold its interest in the loan
as part of a mortgage loan purchase agreement (the "MLPA") to
JPMorgan Chase Commercial Mortgage Securities Corp. ("JPMCC").

JPMCC, in turn, deposited the commercial loan into the JPMCC
Commercial Pass-Through Series 2002-CIBC4 Trust (the "Trust"),
and, in relevant part, assigned its rights under the MLPA to
plaintiff Wells Fargo.

Beginning in 2006, their operating agreement having
expired, the three anchor stores shut down and were taken over
by a nonretail tenant.  Faced with the closure of the anchor
stores and the resulting loss of customer traffic, the inline
mall tenants began closing their own stores.

In June of 2009, the Partnership's loan was transferred to
special servicing due to imminent default.  In July of 2009, the
Partnership's lessor gave notice of defaults under the Ground
Lease, including the Partnership's failure to operate the
property as a "first-class regional shopping mall" as required
by Section 5.06(a) of the Ground Lease.  A second notice
followed in August of 2009, informing the Partnership that the
Ground Lease would be terminated.  In September of 2009, the
Partnership defaulted on the commercial loan.

On December 23, 2010, Wells Fargo demanded that JPMorgan
repurchase the loan because JPMorgan's "representations and
warranties regarding the Ground Lease and its origination
practices were untrue."  Compl. at 10.  The MLPA provided that
such demand was "the sole remedy available to the Purchaser" in
the event of breach.  Compl. ex. 2.  JPMorgan denied that it had

breached any representation and warranty and refused to

repurchase the commercial loan.  On August 7, 2012, the Trust

sold its interest in the Ground Lease at a loss of roughly $73

million.  Wells Fargo then brought this lawsuit, alleging that

JPMorgan breached its contract by making false representations

and warranties in the MLPA and by failing to repurchase the

loan.  JPMorgan now moves to dismiss the action as time barred.

**DISCUSSION**

New York enforces a six-year statute of limitations for

breach-of-contract claims.  N.Y. C.P.L.R. § 213(2).  "[I]t is

well settled that the statute of limitation for breach of

contract begins to run from the day the contract was breached,

not from the day the breach was discovered, or should have been

discovered."  ABB Indus. Sys., Inc. v. Prime Tech., Inc., 120

F.3d 351, 360 (2d Cir. 1997).  This is true even when the

alleged injury occurs after the breach itself.  Ely-Cruikshank

Co. v. Bank of Montreal, 81 N.Y.2d 399, 402 (1993); see also

T & N PLC v. Fred S. James & Co. of New York, 29 F.3d 57, 60 (2d

Cir. 1994) ("[N]either knowledge of the breach nor cognizable

damages are required to start the statute of limitations running

at breach."); Structured Mortg. Trust 1997-2 v. Daiwa Fin.

Corp., No. 02 Civ. 3232 (SHS), 2003 WL 548868, at *2 (S.D.N.Y.

Feb. 25, 2003) ("The New York Court of Appeals applies an

accrual-at-breach rule even when the breach and injury are not

5

simultaneous."). Wells Fargo filed its complaint on August 10, 2012, so the suit is timely only if the cause of action accrued on or after August 10, 2006.

## A.    Timing of the Alleged Breaches

JPMorgan argues that Wells Fargo's own allegations show that any breach occurred no later than April 29, 2002, the date the MLPA was executed. Indeed, the complaint includes numerous instances that show that the problems Wells Fargo now complains of existed no later than 2002.

First, Wells Fargo alleges that JPMorgan's representation in the MLPA that the Ground Lease "did not contain any use restrictions that would materially and adversely affect the security provided by the Mortgage" was untrue because of the presence of the First Class Mall Restriction in Section 5.06(a). This provision was added to the Ground Lease when the loan was originated in 2001. Wells Fargo alleges that the restriction was "impossible to satisfy" for several reasons, all of which existed at the restriction's inception: (1) the leased property did not include the mall's three anchor stores and therefore the Trust could not ensure they would be operated in a way that preserves the retail nature of the mall to satisfy the restriction; (2) the leased property did not include the anchor stores and thus, by definition, the leased property could not be considered a regional mall; (3) the restriction was not made

6

conditional on the continued operation of the anchor stores as such; and (4) the restriction gave the lessor the ability to void the Ground Lease, leaving the Trust without collateral for the commercial loan and inhibiting the free assignment of the Trust's interest in the Ground Lease.  The complaint also alleges that early termination of the parking rights would prevent the Trust from making meaningful recovery on its collateral.

Second, the complaint alleges that the MLPA's representation and warranty regarding compliance with underwriting standards was untrue because JPMorgan "failed to meet its underwriting standards when it originated" the loan. Wells Fargo alleges that underwriting standards required JPMorgan "to determine whether the Ground Lease contained any restriction that was incapable of performance," and that JPMorgan failed to do so for the reasons just described.  Wells Fargo further alleges that JPMorgan did not comply with underwriting standards because it "should have required that the First Class Mall Restriction be tied to the retail operating covenants of the Anchor Stores."  The origination of the loan took place in 2001, and the alleged misrepresentations were made in 2002.

All of these alleged facts existed at the time of origination and at the time the MLPA was executed in 2002.

Wells Fargo's claim, brought in 2012, therefore falls outside New York's six-year statute of limitations.

## B.    Relevance of the Demand Requirement

Wells Fargo makes two arguments as to why the MLPA's demand provision defeats JPMorgan's statute of limitations defense. Both are without merit.

### 1. The Limitations Period Commenced When Wells Fargo Could Have Made the Demand.

Wells Fargo first argues that the cause of action accrued not upon JPMorgan's initial breach but rather upon JPMorgan's refusal in 2010 to honor the repurchase demand.

In cases involving contractual demand provisions, the general rule in New York is that "the cause of action accrues when the party making the claim possesses a legal right" to make the demand, not when the demand actually occurs. Hahn Auto. Warehouse, Inc. v. Am. Zurich Ins. Co., 18 N.Y.3d 765, 770 (2012) (alterations omitted). This rule prevents a plaintiff from indefinitely extending the statute of limitations by waiting to make a demand. Id. The New York statutes essentially codify this rule, providing that "where a demand is necessary to entitle a person to commence an action, the time within which the action must be commenced shall be computed from the time when the right to make the demand is complete." N.Y. C.P.L.R. § 206(a).

The exception is for demands that are substantive rather
than procedural in nature.  Cont'l Cas. Co. v. Stronghold Ins.
Co., Ltd., 77 F.3d 16, 21 (2d Cir. 1996).  A substantive demand
is one that is "an essential element" of the cause of action.
Id. at 21; Frigi-Griffin, Inc. v. Leeds, 52 A.D.2d 805, 806 (1st
Dep't 1976).  A useful example is a claim for replevin of stolen
artwork from a good-faith purchaser.  The defendant commits no
wrong, and thus no cause of action accrues, until he refuses the
rightful owner's demand for return of the piece.  See Solomon R.
Guggenheim Found. v. Lubell, 77 N.Y.2d 311, 317-20 (1991).

This is not such a case.  "The cause of action" --
misrepresentations in the MLPA -- "existed and the defendant's
conduct giving rise to the claim was complete before the demand
was made."  Hoelzer v. City of Stamford, Conn., 722 F. Supp.
1106, 1113 n.34 (S.D.N.Y. 1989), aff'd, 933 F.2d 1131 (2d Cir.
1991).  The demand at issue here is not a substantive element of
the underlying claim for breach but merely a procedural
prerequisite to suit.  The general rule of N.Y. C.P.L.R.
§ 206(a) therefore applies, and the statute of limitations began
running when Wells Fargo first could have made its demand.  See
ACE Securities Corp. v. DB Structured Prods., Inc., 977 N.Y.S.2d
229, 231 (1st Dep't 2013) ("The motion court erred in finding
that plaintiff's claims did not accrue until defendant either
failed to timely cure or repurchase a defective mortgage loan.

To the contrary, the claims accrued on the closing date of the
MLPA, . . . when any breach of the representations and
warranties contained therein occurred." (citing Daiwa, 2003 WL
548868)).

   **2. Wells Fargo Had the Right to Demand Repurchase in 2002.**

   Wells Fargo next argues that, even if § 206(a) applies, the
MLPA permitted demand only when a breach of a representation or
warranty "materially and adversely affect[ed] the value" of the
loan, and that no material and adverse effect ("MAE") was
present until default occurred in 2009.  In effect, the argument
is that Wells Fargo was unable to make a demand until it
incurred a financial loss resulting from the breach.  Both the
complaint and the contract belie that argument.

   Wells Fargo's construction of the MAE requirement is at war
with its pleadings.  The main allegation in the complaint is
that the First Class Mall Restriction rendered untrue JPMorgan's
representation that the Ground Lease "does not restrict the use
of the related Mortgaged Property . . . in a manner that would
materially and adversely affect the security provided by the
Mortgage."  If this representation was indeed false, it follows
that the Ground Lease's restrictions, which were present in
2002, did "materially and adversely affect" the value of the
property.  Wells Fargo also alleges that JPMorgan breached
underwriting standards requiring it to "determine whether the

Ground Lease contained any restriction that was incapable of performance." The First Class Mall Restriction, Wells Fargo urges, was "impossible to satisfy" and therefore a "fatal flaw at origination." Surely a fatally flawed loan is one whose value is materially and adversely affected. Finally, the complaint alleges that the loan's value was impaired by the early termination of the parking easement. But if tangible loss is indeed the requirement, then this allegation is premature because the parking lot will continue to exist at least until 2021 and possibly beyond. (The complaint alleges merely that the new tenant "intends" to tear up the lot at that time.)

More importantly, nothing in the contract's language suggests that an actual financial loss must precede a repurchase demand. A growing consensus among New York courts holds that MAE repurchase conditions are triggered when the plaintiff's risk of loss increases and not just when that risk actualizes. See, e.g., Homeward Residential, Inc. v. Sand Canyon Corp., No. 12 Civ. 7319 (AT), 2014 WL 572722, at *14 (S.D.N.Y. Feb. 14, 2014); Assured Guar. Mun. Corp. v. Flagstar Bank, FSB, 892 F. Supp. 2d 596, 602 (S.D.N.Y. 2012); Syncora Guar. Inc. v. EMC Mortg. Corp., 874 F. Supp. 2d 328, 339-40 (S.D.N.Y. 2012); MBIA Ins. Corp. v. Countrywide Home Loans, Inc., 105 963 N.Y.S.2d 21, 22-23 (1st Dep't 2013). In pressing a contrary interpretation, Wells Fargo essentially asks this Court to read the MAE

requirement as an agreement between the parties that a cause of action would not accrue until JPMorgan's breach resulted in a tangible loss.  But just as demand provisions cannot indefinitely extend the statute of limitations, they likewise may not be construed to circumvent New York's well established accrual-at-breach rule.  Cf. Daiwa, 2003 WL 548868, at *3 ("In effect, plaintiffs are asking this Court to find that, in contract cases where there is a demand requirement, C.P.L.R. § 206(a) imposes the otherwise rejected accrual-at-injury rule. Plaintiffs' argument must be rejected.").  Wells Fargo could have demanded repurchase as early as the 2002 closing date of the MLPA, so that is the date that controls for statute-of-limitations purposes.

## C.    Equitable Estoppel

Wells Fargo styles its final argument as one for "equitable tolling."  While the federal courts sometimes distinguish between equitable tolling and the related doctrine of "equitable estoppel," New York courts typically do not.  Tenamee v. Schmukler, 438 F. Supp. 2d 438, 443 n.3 (S.D.N.Y. 2006). Semantics notwithstanding, to escape the statute of limitations on this ground a plaintiff must show that it has been "prevented in some extraordinary way from exercising [its] rights." Johnson v. Nyack Hosp., 86 F.3d 8, 12 (2d Cir. 1996).

Wells Fargo has made no such showing here.  To the extent the argument relies upon omissions on JPMorgan's part, it fails because, as Wells Fargo admits, the doctrine requires that "the opposing party acted to render the plaintiff unaware that the cause of action existed."  Def's Opp'n Mem. at 13 (emphasis added) (citation and internal quotation marks omitted).  And to the extent it relies upon JPMorgan's affirmative misrepresentations, it fails because those alleged inaccuracies are precisely what gave rise to this lawsuit in the first place. "[E]quitable estoppel does not apply where the misrepresentation or act of concealment underlying the estoppel claim is the same act which forms the basis of plaintiff's underlying substantive cause of action."  Kaufman v. Cohen, 760 N.Y.S.2d 157, 167 (1st Dep't 2003) (citing Rizk v. Cohen, 73 N.Y.2d 98, 105–106 (1989)).  Were that not so, this "extraordinary" remedy would become quite ordinary indeed in contractual misrepresentation cases, which virtually by definition involve plaintiffs who have been misled.

**CONCLUSION**

For the foregoing reasons, JPMorgan's motion is granted and the complaint is dismissed.  The Clerk is directed to close this case.


SO ORDERED.

Dated:    New York, New York
          March 27, 2014


                                  S/_____
                                      MIRIAM GOLDMAN CEDARBAUM
                                   United States District Judge